# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| LATWANA L. GILLIS, | : | Case No. 1:12 CV 01087 |
| Plaintiff, | : | |
| v. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

## I. INTRODUCTION.

In accordance with the provisions of UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF OHIO LOCAL RULE 72.2, this case was automatically referred to the undersigned Magistrate Judge for report and recommendation.  Plaintiff seeks judicial review of Defendant's final determination denying her claims for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  The issues before the Court are presented in Briefs filed by the parties (Docket Nos. 13 &14).  For the reasons that follow, the undersigned Magistrate Judge recommends that the Court affirm the Commissioner's decision.

## II. FACTUAL & PROCEDURAL BACKGROUNDS.

On March 10, 2010, Plaintiff filed applications for DIB and SSI, alleging a disability onset date of June 1, 2006 (Docket No. 11, pp. 168, 175 of 878). Her claims were denied initially on April 26, 2010, and again upon reconsideration on October 12, 2010 (Docket No. 11, pp. 95-97, 99-101, 102-105, 107-110, 116-118, 120-122, 123-126, 127-129 of 878). An administrative hearing was conducted on July 26, 2011, by Valencia Jarvis, an Administrative Law Judge (ALJ) (Docket No. 11, pp. 18, 35 of 878). On August 12, 2011, the ALJ determined that Plaintiff was neither entitled to a period of disability nor eligible for SSI (Docket No. 12, pp. 18-29 of 878). The Appeals Council denied Plaintiff's request for review on March 1, 2012 (Docket No. 1, pp. 5-7 of 878).

### A. THE ADMINISTRATIVE HEARING.

The ALJ presided over the administrative hearing via video from St. Louis, Missouri. Plaintiff appeared in person, with counsel, and testified, in Cleveland, Ohio. Mary A. Harris, a Vocational Expert (VE), also appeared and testified (Docket No. 11, pp. 37, 85 of 878).

#### 1. PLAINTIFF'S TESTIMONY

##### A. BACKGROUND

Plaintiff is a single mother who has had primary responsibility for her daughter since birth. Plaintiff completed the 11th grade but did not graduate from high school or complete the proficiency requirements for her general equivalency degree (GED) (Docket No. 11, pp. 73-74 of 878).

##### B. PSYCHOLOGICAL IMPAIRMENTS

At the hearing, Plaintiff testified that she was hospitalized for one or two weeks in December 2009 at St. Vincent Charity Hospital (St. Vincent) in Cleveland, Ohio. She stated that prior to being

2

admitted she experienced hallucinations and had ultimately barricaded herself in her room.  After being released from St. Vincent, Plaintiff testified that she attended daily Alcoholics Anonymous (AA) treatment at Rosary Hall for approximately twelve weeks, followed by "after care" for approximately six weeks.  During this time period, Plaintiff received treatment for drug abuse and several psychological conditions (Docket No. 11, pp. 40-42 of 878).

Plaintiff testified that she received treatment from Drs. Martin and Schweid for what she described as "suicide thoughts" and "bad dreams."  She also testified that she has hallucinations during which she sees dead people and hears voices telling her to kill people.  She has difficulty sleeping, which is occasionally relieved by medication (Docket No. 11, pp. 44-46 of 878).

Plaintiff testified that while taking Zyprexa®, she experienced persistent symptoms of hallucinations, mood swings, and "being in zombie mode," which she described as a state of being "stuck," or "pausing" and "coming in and out."  She said that subsequent medications prescribed by Dr. Schweid, including Risperdal, Cogentin, and Tegretol, seem to help "sometimes," and sometimes result in her feeling happy and "not too stuck."  Specifically, Plaintiff said that Risperdal stops her from hearing voices and helps her sleep at night and Cogentin helps to control her mood swings. Plaintiff felt that her medications help her most of the time, but not all of the time.  Side effects from the medication included lethargy, drowsiness and fluctuations between happiness and sadness (Docket No. 11, pp. 48-51 of 878).  Upon further examination by the ALJ, Plaintiff indicated that her hallucinations occur daily and that her medication helps "sometimes" (Docket No. 11, pp. 81-82 of 878).

When questioned about a December 2009 drug test resulting in a finding of phencyclidine (PCP) in Plaintiff's system, Plaintiff reported that she might have used drugs since, but was not

3

currently using drugs.  She stated that drugs were most recently an issue for her at the beginning of the previous year, coinciding with the time of her treatment.  She stated that she had been telling her counselors at Murtis Taylor whether she was using drugs or not, and that they would know whether or not she was using (Docket No. 11, pp. 51-53).

Plaintiff admitted that stress surfaced when she used drugs; her ability to focus was affected, and during some weeks, she sustained up to two absences from work (Docket No. 11, pp. 82-84). Plaintiff admitted that being around people caused paranoia.  Specifically, entering a room or being in a room with three people distracted her and she would walk on another sidewalk to avoid encounters with people (Docket No. 11, pp. 63-64 of 878).

        c.      **PHYSICAL IMPAIRMENTS**.

Plaintiff testified that she has arthritis in her knees, asthma, and bronchitis.  She stated that she has an inhaler for her asthma that she has to use "frequently" due to panic attacks.  Plaintiff had to use a nebulizer several times within the last year due to constriction in her lungs (Docket No. 11, pp. 53- 55 of 878).

        d.      **EMPLOYMENT HISTORY**.

Plaintiff provided substantial testimony regarding her employment history, explaining that she had done some part-time work as a cosmetologist, babysitter, a fast food specialist and maintenance engineer, cleaning parks and projects for the City.   Although she was unlicensed and had not attended cosmetology school, Plaintiff stated that for three months in 2010, she worked as a hair stylist in her home, cutting hair, styling, braiding, wrapping, and providing glue-ins.  Plaintiff claimed that she worked approximately ten hours daily, three to four days per week (Docket No. 11, pp. 70-71, 80 of 878).

She testified about providing child care in 2008 and for several months in 2009. Plaintiff provided care in her home for two or three children three to four hours per day, four to five days per week, without the assistance of others. Plaintiff articulated that she did not provide child care in 2010 (Docket No. 11, pp. 67-70, 73 of 878).

Plaintiff said that she had worked at Dirt Devil approximately ten years ago, had worked in fast food services, and had worked in maintenance/cleaning. Plaintiff opined that she could not return to any of her previous jobs on a full-time basis due to the effect of her medications (Docket No. 11, pp. 56-58 of 878).

     **e.**       **RESIDUAL FUNCTIONAL CAPACITY**.

Plaintiff testified that she had issues walking. She stated that her knees buckle and she has fears of falling. However, she was unsure how far she could walk without difficulty because her walking is limited (Docket No. 11, p. 59 of 878). When asked to opine about her ability to stand and/or walk, Plaintiff replied that since she had lost weight, her knees had improved. She was unsure of how long she could stand without sitting because she always leans on something when she stands. Nonetheless, Plaintiff estimated that she could stand for 15-20 minutes, but may have to lean on something before the 15-20 minute period had expired (Docket No. 11, pp. 58-59).

Plaintiff also testified that she has issues sitting, but felt comfortable with her sitting position at the hearing. She stated that she had problems sitting at a low level because it was difficult to get up (Docket No. 11, p. 60 of 878).

Plaintiff stated she had difficulties concentrating and could not focus "on one thing." She explained that she gets distracted by her thoughts, and said that she might fail to finish a household activity such as cleaning the stove because she transfers her attention to another household activity

5

such as cleaning the bathroom or folding laundry.  She further testified that eventually she does complete all of her household activities despite her distractions (Docket No. 11, pp. 61-62 of 878).

Plaintiff testified that she does "not get along with a lot of people at all," that she does not go out much, and that her activities consist mostly of watching television, reading, taking her daughter to school, and teaching her daughter (Docket No. 11, p. 64 of 878).

2.      THE VE'S TESTIMONY.

The VE, a certified rehabilitation counselor, reviewed portions of the record that pertained to work history (Docket No. 11, pp. 133-134 of 878).  She categorized Plaintiff's past relevant work consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT)[1] as she performed it:

| JOB & DOT | Exertional Level | SVP | Skill Level |
|---|---|---|---|
| Fast Food Worker DOT 311.474-010 | **Light work** involves lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds. A job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C. F. R. § 1567 (b). | **2**--the amount of lapsed time required for a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in this job is anything beyond short demonstration up to and including one month. | **Unskilled work** is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C. F. R. § 1568(a). |
| Assembler DOT 706.684-022 | Light | 2 | Unskilled |
| Groundskeeper DOT 406.687-010 | Light | 2 | Unskilled |
| Childcare Monitor DOT 301.677-010 | Medium work requires almost constant standing or walking, or kneeling, squatting, bending, climbing along with lifting 50 pounds occasionally and up to 25 pounds frequently.    20 C. F. R. §§ 404.1567(b), 416.967(b). | 3--the amount of lapsed time required for a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in this job is anything over one month and including three months. | Semi Skilled work is work that needs some skills but does not require doing the more complex work duties. |

---

[1]

The revised Fourth Edition provides a wide range of occupational information with application to job placement, occupational research, career guidance, labor-market information, curriculum development and long-range job planning.  DOT, 1991 WL 645961(4th ed. 1991).

6

| Hairstylist<br>DOT 332.271-018 | Light | 6-the amount of lapsed time required for a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in this job is anything over one year up to and including two years. | Skilled work requires a fairly high level of complexity; types of work that requires using judgment to determine the machine and manual operations in order to obtain the right quantity and quality of item produced. 20 C. F. R. §§ 404.1568(c); 416.968(c). |

(Docket No. 11, p. 86 of 878).

The ALJ then asked the VE to consider a hypothetical individual that was similar to Plaintiff in age, education, and work experience with no exertional limitations.  The hypothetical individual would need to perform simple, routine work in a relatively static environment, with limited contact with others, including the general public, and free of fast-paced production requirements.  When asked if that individual would be able to perform Plaintiff's past relevant work, the VE responded that the hypothetical individual could perform Plaintiff's past position of groundskeeper.

The ALJ than added the following limitation to the hypothetical person:  an environmental limitation in which the person must avoid concentrated exposure for asthma to irritants such as fumes, odors, dust, gases, and poorly ventilated areas.  The VE indicated that the hypothetical person could still perform the job of groundskeeper with the added limitation.

Finally, the ALJ asked the VE to consider the same hypothetical person with the further limitation that the person will need to miss two days of work per month.  The VE testified that when the person needs to miss two days per month, that person would be able to perform the past relevant work, and that it became an issue when it was any more than two days per month.  In relation to the Plaintiff's testimony about having missed one to two days per week, the VE stated that a person would be unemployable at that point (Docket No. 11, pp. 86-87 of 878).

Counsel for Plaintiff also inquired of the VE, and asked if, in her experience, a groundskeeper

7

was regularly exposed to gas fumes, fertilizer fumes, and lawn care fumes.  The VE testified that a groundskeeper would not be exposed to the aforementioned fumes in a concentrated or enclosed space.  The ALJ than asked the VE to consider a hypothetical individual who was limited to unskilled work with no exertional limitations, who required frequent re-direction, and asked if such a person could return to Plaintiff's past relevant work.  The VE responded that such an individual could not return to the past relevant work and that there were no jobs in the national economy for someone with those limitations (Docket No. 11, pp. 87-88 of 878).

### III.  THE MEDICAL EVIDENCE.

The cornerstone for the determination of disability under both Title II and Title XVI is the medical evidence.  Each person who files a disability claim is responsible for providing medical evidence from sources who have treated or evaluated the claimant, determined that the impairment exists and assessed the severity of that impairment.  20 C. F. R. § 404.1512((b), (c).  In this case, the medical records show that Plaintiff has a history of a variety of conditions such as hepatitis B, diabetes, hypertension, headaches, and genitourinary issues, which date back to 2002.  However, Plaintiff has alleged a disability onset date of June 1, 2006 and the relevant medical records available to the ALJ begin on December 7, 2009 (Docket No. 13, p. 5 of 23).

### 1.    ST. VINCENT CHARITY HOSPITAL.

On December 7, 2009, Cleveland Police brought Plaintiff to the psychiatric emergency department at St. Vincent, due to delusions and bizarre behavior.  Plaintiff said she had "had a nervous breakdown."  Testing positive for PCP, Plaintiff admitted to smoking a pack of cigarettes daily since age 15, smoking marijuana " a lot" and drinking one beer per day.  She denied suicidal ideations and past suicide attempts.  Diagnosed with possible schizoaffective disorder, although

substance induced psychosis is likely, Plaintiff was admitted to the hospital for substance abuse evaluation and started on Zyprexa, a medication used to treat symptoms of psychotic conditions, and Klonopin, a medication used to treat panic disorders.  On the numeric scoring continuum used by mental health clinicians and physicians to rate subjectively the social, occupational and psychological functioning of adults on how well or adaptively one is meeting the various problems in living or Global Assessment of Functioning (GAF), the attending physician determined that Plaintiff had serious symptoms or any serious impairment in social, occupational or school functioning.  Plaintiff remained hospitalized until December 12, 2009.  Upon discharge, it was noted that Plaintiff's condition had improved, she was not suicidal, did not have any limitations on her ability to care for herself and did not have any auditory or visual hallucinations (Docket No. 11, pp. 744-747, 757-758 of 878; *Diagnostic and Statistical Manual of Mental Disorders* 30 94th ed. 1994)).

### 2. MURTIS TAYLOR HUMAN SERVICES SYSTEM.

On December 17, 2009, Plaintiff underwent an adult diagnostic assessment at this mental health and addiction treatment-based center.  Diagnosed with a schizoaffective disorder (bipolar type),  with both substance induced mood disorder and  borderline personality disorder ruled out, Plaintiff's GAF was once again within the serious range of symptoms or any serious impairment in social, occupational or school functioning.   It was recommended that Plaintiff undergo pharmacological management and counseling when she became more stable (Docket No. 11, pp. 781-790 of 878).

Plaintiff underwent a psychiatric evaluation on January 30, 2010, to assess her past psychiatric history, current medications and mental status.  Stephanie Martin, a Murtis Taylor clinician, was unable to obtain a comprehensive medical history because Plaintiff was a poor historian with respect to determining mental status and medical history.  Ms. Martin concurred in the

9

diagnosis that Plaintiff had a schizoaffective disorder, bipolar type.  She opined that Plaintiff's GAF was 45.  This score denotes the presence of serious symptoms or any serious impairment in social, occupational, or school functioning (Docket No. 11, pp. 436-439 of 878).

On March 4, 2010, Virginia Brennan, a social worker at Murtis Taylor, completed a MENTAL STATUS QUESTIONNAIRE on behalf of Plaintiff at the request of the Ohio Disability Determination Services, Bureau of Disability Determination (Docket No. 11, p. 428 of 878).  Ms. Brennan reported Plaintiff's symptoms including lack of motivation; blunted affect; depressed and sad mood; sleep disturbance with racing thoughts; past attempts of self harm (but currently no plans to harm self or others); psychomotor agitation; feelings of guilt, hopelessness, helplessness, worthlessness; little energy; daily mood swings; panic attacks; Agoraphobia (fear of crowds); a history of marijuana, alcohol, and PCP abuse; paranoid thinking; auditory and visual hallucinations; and, recurrent and intrusive recollections of trauma (Docket No. 11, pp. 423-425 of 878).  She also noted that Plaintiff was well dressed and groomed, related to her and other staff well, was cooperative throughout, had normal speech, was goal oriented, and had coherent associations.  Ultimately, she concluded that Plaintiff had a schizoaffective disorder, bipolar type, and she ruled out borderline personality disorder and substance induced mood (Docket No. 11, pp. 422-428 of 878).

Mary T. Harrison, an advanced practice nurse at Murtis Taylor opined on March 4, 2010, that Plaintiff had a history of impulsive behaviors in addition to substance abuse and that she was likely to "misappropriate" any funds received.  She recommended that Plaintiff obtain a payee if awarded benefits (Docket No. 11, p. 431 of 878).

On April 10, 2010, Plaintiff underwent clinical intervention to review her medications, their strength and her compliance with treatment.  The clinician opined that Plaintiff's judgment and compliance with treatment was limited (Docket No. 11, p. 432 of 878).

During the course of her treatment at Murtis Taylor, Plaintiff frequently saw Dr. Daniel Schweid, M.D., a psychiatrist.  On June 19, 2010, Plaintiff reported auditory and visual hallucinations and difficulty sleeping.  She also indicated drinking a six pack of beer two weeks prior.  Dr. Schweid noted her appearance, eye contact and speech were normal.  While she was cooperative, Dr. Schweid noted that her judgment was poor and her compliance with treatment varied.  He prescribed Zyprexa, Risperdal, and Tegretol, all medications used to treat symptoms of mental illness (Docket No. 11, p. 771 of 787).

Plaintiff returned to Dr. Schweid on July 16, 2010.  He noted that she was "doing OK", that she liked her medication, and that she was sleeping fine.  He also reported that she heard voices the previous week, and may have had visual hallucinations as well.  Plaintiff denied drug or alcohol use and she was well groomed, with normal eye contact and speech.  She was cooperative once again. Dr. Schweid reported her judgment had improved to fair and that she was complying with treatment. He continued her on Risperdal and Tegretol and administered Cogentin, a medication used to control tremors and stiffness in muscles due to certain anti-psychotic medicines (Docket No 11, p. 770 of 787; PHYSICIAN'S DESK REFERENCE, 2006 WL 374484 (2006)).

During her August 2010 check-up with Dr. Schweid, Plaintiff was "doing OK," was not hearing voices, denied drug or alcohol use, was sleeping well, and was not depressed.  She was once again cooperative, well groomed and her eye contact and speech were normal.  She was not experiencing any hallucinations.  Her judgment was "OK" and she was still complying with treatment.  Dr. Schweid continued her medications (Docket No. 11, p. 769 of 787).

Progress notes from September 24, 2010, once again indicate that Plaintiff was doing "OK" and was not experiencing any delusions, paranoia or hallucinations.  She was sleeping fine and was not depressed.  Her judgment was still normal and she was still complying with treatment.  Dr.

11

Schweid continued Plaintiff on her medication (Docket No. 11, p. 767 of 787)

      3.    **ROSARY HALL ADDICTION CENTER & SERVICES AT ST. VINCENT.**

To obtain treatment for her alcohol and drug problems, Plaintiff went to Rosary Hall, a facility at St. Vincent Charity Hospital dedicated to assist with the battles of alcoholism and drug dependency, on December 18, 2009.  A Comprehensive Intake Assessment form was completed by counselor Claudette Brown, who noted that Plaintiff felt it extremely important to obtain help because someone had placed PCP in her drink causing her earlier hospitalization at the "psych ward."  However, she disagreed that drinking and drugs caused her problems with the law, problems in thinking, or problems in her relationships with others.  She was unsure whether continued drug use would cause her to die. She also admitted to feeling suicidal about six months ago as well as to an attempt at suicide at that time, but she had not felt suicidal during the past 30 days.  She reported hallucinations before and during the assessment, and acknowledged that some of her hallucinations were due to drug and alcohol use.  Plaintiff reported some withdrawal symptoms (Docket No. 11, pp. 732-742 of 878; www.stvincentcharit.com/.../behavioral-health/rosary-hall.aspx).

From February 26, 2010, to April 9, 2010, Plaintiff attended an Intensive Outpatient Program at Rosary Hall in order to address her drug and alcohol abuse.  Upon admittance, Plaintiff was diagnosed with "PCP Dependence and Alcohol Dependence with Psychological Dependence."  Plaintiff denied alcoholism and had trouble accepting her disease.  Her drug and alcohol tests were consistently negative yet she was uncooperative, argumentative with staff, refused to follow directions given by staff and generally had poor attendance.  She completed the Relapse Prevention Program and obtained a sponsor to assist with the outpatient treatment plan.  She was discharged with a recommendation to contact her sponsor daily and to attend three AA meetings weekly (Docket No. 11, pp. 729-731 of 878).

Plaintiff began treatment in the Aftercare program at Rosary Hall on April 12, 2010.  The Aftercare records completed by Claudette Brown indicate that Plaintiff attended eight Aftercare sessions over 2 months, and that she missed sessions "due to illness or other matters requiring her attention."  Furthermore, Ms. Brown indicated that Plaintiff was alert, attentive and participated in treatment.  Plaintiff did not show signs of intoxication or withdrawal while in Aftercare and reported that she was enjoying sobriety and the less chaotic and stressful life it provided.  On June 28, 2010, Plaintiff graduated from Aftercare with a certificate of completion (Docket No. 11, p. 728 of 878).

  **4.**  D<small>R</small>. V<small>ICKI</small> W<small>ARREN</small>, P<small>H</small>D, S<small>TATE</small> A<small>GENCY</small> E<small>XAMINER</small>

On April 16, 2010, Dr. Warren completed a M<small>ENTAL</small> R<small>ESIDUAL</small> F<small>UNCTIONAL</small> C<small>APACITY</small> A<small>SSESSMENT</small> and P<small>SYCHIATRIC</small> R<small>EVIEW</small> T<small>ECHNIQUE</small> on behalf of Plaintiff (Docket No. 11, pp. 454, 457 of 878).

In the Mental Residual Functional Capacity Assessment section labeled "Understanding and Memory," Dr. Warren found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures and the ability to understand and remember very short and detailed instructions.  She was moderately limited in her ability to understand and remember detailed instructions (Docket No. 11, p. 454 of 878).

Regarding Plaintiff's "Sustained Concentration and Pace," Dr. Warren found that Plaintiff was not significantly limited in her ability to carry out short and simple instructions, sustain an ordinary routine without special supervision and make simple work-related decisions.  She found that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and work in coordination with or proximity to others without being distracted (Docket No. 11, pp. 454-455 of 878).

13

In the area of "Social Interaction," Dr. Warren found that Plaintiff was not significantly limited in her ability to ask simple questions or request assistance and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Plaintiff was deemed moderately limited in her abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors and get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Docket No. 11, p. 455 of 878).

In terms of adaptation, Dr. Warren found that Plaintiff was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others.  She found Plaintiff moderately limited in her ability to respond appropriately to changes in the work setting (Docket No. 11, p. 455 of 878).

In making a functional capacity assessment, Dr. Warren concluded that Plaintiff "retains the ability to perform simple, routine work in a relatively static environment where there is limited contact with others, including the general public and where there are no required strict production or high speed demands" (Docket No. 11, p. 457 of 878).

In her PSYCHIATRIC REVIEW TECHNIQUE form completed for the period of June 1, 2006 through April 16, 2010, Dr. Warren determined that Plaintiff had two medically determinable impairments, specifically, a schizoaffective disorder bipolar type that did not precisely satisfy the diagnostic criteria of 12.03 of the LISTING, and a polysubstance abuse disorder, that did not precisely satisfy the diagnostic criteria of 12.09 of the LISTING (Docket No. 11, pp. 460-467 of 878).

In assessing Plaintiff's functional limitations, Dr. Warren found Plaintiff had mild limitations in her restrictions of activities of daily living and moderate limitations in her difficulties in maintaining social functioning and maintaining concentration, persistence and pace.  Plaintiff had no

14

episodes of decompensation, each of an extended duration (Docket No. 11, p. 468 of 878).

5.    CONSULTATIVE EXAMINER, DR. NICK ALBERT, M.D.

Completing a RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT on April 24, 2010, Dr. Albert found no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations and no communicative limitations.  Regarding environmental limitations, he found that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Docket No. 11, pp. 473-476, 479 of 878).

6.    MENTAL IMPAIRMENT QUESTIONNAIRE.

On July 22, 2011, Dr. Schweid completed a MENTAL IMPAIRMENT QUESTIONNAIRE on behalf of Plaintiff.  He diagnosed Plaintiff with schizoaffective disorder and attributed a present GAF and highest GAF during the past year of 55[2].  A mental status examination found clinical findings of "hallucinations" and "mood variability."  He described her prognosis as "guarded" (Docket No. 11, p. 870 of 878).

Dr. Schweid also completed a check-the-box form identifying the Plaintiff's signs and symptoms.  In doing so he identified the following signs or symptoms present in addition to his clinical findings of hallucinations and mood variability: decreased energy, impaired impulse control, mood disturbance, difficulty thinking or concentrating, persistent disturbance of mood or affect, intense and unstable interpersonal relationships and impulsive and damaging behavior, hallucinations or delusions,  autonomic hyperactivity, and sleep disturbance (Docket No. 11, p. 871 of 878).

The following chart reflects Dr. Schweid's findings regarding Plaintiff's ability to perform unskilled work:

---

[2]
A GAF of 55 denotes moderate symptoms or moderate difficulty in social, occupational or school functioning.

| Mental Abilities and Attitude Needed to do Unskilled Work | Unlimited or Very Good | Limited but Satisfactory | Seriously Limited |
|---|---|---|---|
| Remember work-like procedures | | ✓ | |
| Understand and remember very short and simple instructions | ✓ | | |
| Carry out very short and simple instructions | ✓ | | |
| Maintain attention for two hour segment | | | ✓ |
| Maintain regular attendance and be punctual within customary, usually strict tolerances | | | ✓ |
| Sustain an ordinary routine without special supervision | | | ✓ |
| Work in coordination with or proximity to others without being unduly distracted | | ✓ | |
| Make simple work-related decisions | ✓ | | |
| Complete a normal workday and workweek without interruptions from psychologically based symptoms | | | ✓ |
| Perform at a consistent pace without an unreasonable number and length of rest periods | | ✓ | |
| Ask simple questions or request assistance | ✓ | | |
| Accept instructions and respond appropriately to criticism from supervisors | | ✓ | |
| Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes | | ✓ | |
| Respond appropriately to changes in a routine work setting | | ✓ | |
| Deal with normal work stress | | | ✓ |
| Be aware of normal hazards and take appropriate precautions | ✓ | | |

(Docket No. 11, p. 872 of 878).

Dr. Schweid then made the following findings regarding Plaintiff's ability to perform semiskilled and skilled work:

| Mental Abilities and Attitude Needed to do Semiskilled and Skilled Work | Unlimited or Very Good | Limited but Satisfactory | Seriously Limited |
|---|---|---|---|
| Understand and remember detailed instructions | | | ✓ |
| Carry out detailed instructions | | | ✓ |
| Set realistic goals or make plans independently of others | | | ✓ |

16

| | | | |
|---|---|---|---|
| Deal with stress of semiskilled and skilled work | | | ✓ |

(Docket No. 11, p. 873 of 878).

Regarding Plaintiff's ability to do particular types of jobs, Dr. Schweid made the following findings:

| Mental Abilities and Attitude Needed to do Semiskilled and Skilled Work | Unlimited or Very Good | Limited but Satisfactory | Seriously Limited |
|---|---|---|---|
| Interact appropriately wit h the general public | | ✓ | |
| Maintain socially appropriate behavior | | ✓ | |
| Adhere to basic standards of neatness and cleanliness | ✓ | | |
| Travel in an unfamiliar place | | ✓ | |
| Use public transportation | | ✓ | |

(Docket No. 11, p. 873 of 878).

Finally, Dr. Schweid found that Plaintiff's functional limitations were as follows:

| Functional Limitation | Level Limitation: None to Mild | Level Limitation: Moderate | Level limitation: Marked | Level Limitation: Extreme |
|---|---|---|---|---|
| Restriction of activities of daily living | ✓ | | | |
| Difficulties in maintaining social functioning | | ✓ | | |
| Difficulties in maintaining concentration, persistence, or pace | | ✓ | | |
| Episodes of decompensation[3] within 12 month period, each of at least two weeks duration | √ | | | |

(Docket No. 11, p. 874 of 878).

---

[3]

Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).

IV.    STANDARD OF DISABILITY DETERMINATION

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her

18

past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Having considered the standard of disability, medical evidence and testimony of Plaintiff and the VE, the ALJ found that:

(1)    Plaintiff met the insured status requirements of the Act through December 31, 2010.

(2)    Plaintiff had not engaged in substantial gainful activity since June 1, 2006, the alleged onset date (20 C. F. R. § 404.1571 *et seq.*, 416.971 *et seq.*).

(3)    Plaintiff has the following severe impairments: schizoaffective disorder; asthma, PCP and alcohol dependence disorder in remission(20 C. F. R. §§ 404.1520(c), 416.920(c)).

(4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, but is limited to performing simple, routine work in a relatively static environment, can tolerate only limited contact with others including the general public, and cannot work in fast-past production environments. Furthermore, the Plaintiff must avoid exposure to irritants such as fumes, dust, odors, gases and poorly ventilated areas.

(6)    Plaintiff is capable of performing past relevant work as a groundskeeper.  This work does not require the performance of work related activities precluded by the Plaintiff's residual functional capacity (20 C. F. R. §§ 404.1565, 416.965).

(7)    The Plaintiff has not been under a disability, as defined in the Social Security Act from June 1, 2006, through the date of this decision (20 C. F. R. §§ 404.1520(f), 416.920(f)).

(Docket No. 11, pp. 20-22, 24, 28, 29 of 878).

## VI. THIS COURT'S JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant

19

to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g). The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)). The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . *Id.* This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. ANALYSIS.

In her Assignment of Errors, Plaintiff contends that:

1.   The ALJ committed an error of law and her decision is not supported by substantial evidence as she did not indicate the weight she gave to the opinion of Latwana's treating source psychiatrist, Dr. Schweid, and she failed to apply the analysis required by 20 C.F.R.§§ 404.1527, 416.927 and SOCIAL SECURITY RULING (SSR) 96-2p to her opinion.

2.   The ALJ erred by not following the directives of 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), and SSR 96-2p when analyzing the treating source statements of Dr. Schweid, and substantial evidence does not support the ALJ's decision to not give this

20

opinion "controlling weight."

3.  The ALJ erred when she did not follow the directives of 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), and SSR 96-2p after she failed to indicate what weight she was giving to Dr. Schweid's opinion set forth in the MENTAL IMPAIRMENT QUESTIONNAIRE.

4.  The ALJ erred by not following the requirements of 96-8p when making her RFC finding, and her RFC finding is not supported by substantial evidence.

(Docket No. 13, pp. 13, 17, 20 of 23).

Defendant counters with arguments that:

1.  Plaintiff failed to meet her burden of proving that she was disabled under the Act.

2.  The ALJ followed the controlling regulations in weighing the opinion evidence.

3.  Substantial evidence supports the ALJ's Residual Functional Capacity Assessment.

(Docket No. 14, 12, 15 of 19).

**1.      THE WEIGHT GIVEN TO THE OPINIONS OF DR. SCHWEID.**

Plaintiff is correct that the ALJ was required to consider all of the medical opinions contained in the record while making her factual and legal determinations (20 C.F.R. §§ 404.1527, 416.927). While the ALJ was required to consider all of the medical opinions contained in the record, she was not required to categorically accept them.  The ALJ is required to review the record and make findings of fact and conclusions of law based on the evidence.  20 C.F.R. § 404.1527 (e)(2)).

The ALJ specifically notes that she "gave weight to Dr. Schweid's opinion as well, with the exception of his findings of serious limitations in the Plaintiff's work-related functioning."  She gave weight to all of Dr. Schweid's remaining opinions because she found them to be "consistent with his own treatment notes and mental status examinations as well as the record as a whole" (Docket No. 11, p 28 of 878).

The ALJ afforded little weight to Dr. Schweid's opinions regarding Plaintiff's alleged serious

limitations in her work-related functioning because she found them inconsistent with Dr. Schweid's own treatment notes and the medical record as a whole.  She specifically discredited his opinion that Plaintiff could not maintain attention for two hour segments because she found that it was not supported by the record as a whole.  Indeed, the ALJ's decision refers to Plaintiff's testimony that she worked as a hairstylist in 2010, working up to 10 hours per day (Docket No. 11, p. 23 of 878).  The ALJ noted that during her treatment, Dr. Schweid frequently referred to her as "doing OK," was cooperative and displayed good judgment.  Furthermore, she notes Dr. Schweid found that Plaintiff "could satisfactorily remember work-like procedures, work in close proximity to others, perform at a consistent pace without an unreasonable number of breaks, respond appropriately to supervisors, respond appropriately to changes in the routine work setting and interact with the general public" (Docket No. 11, pp. 25, 26 of 878).  Thus, it is clear to the Magistrate that the ALJ indicated the weight she was giving the opinions of Dr. Schweid since she accepted many of them while providing specific reasons for discrediting others.

### 2. THE TREATING SOURCE RULE AND ANALYSIS.

Plaintiff's second and third claims assert that the ALJ failed to attribute controlling weight to Dr. Schweid or alternately, explain what weight was given to the opinions in the MENTAL IMPAIRMENT QUESTIONNAIRE.  Plaintiff's second and third claims are consolidated for purposes of this analysis and dicussion.

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight.  POLICY

22

INTERPRETATION RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, SSR 96-2p (July 2, 1996); *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)).  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)).  Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir.2007)).  Opinions of specialist with respect to the medical condition at issue are given more weight than a nonspecialist.  *Johnson, supra*, (*citing* 20 C. F. R. § 404.1527(d)(5)).

In *Wilson v. Commissioner of Social Security,* 378 F.3d 541 (6th Cir.2004), the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.  *Harris v. Commissioner of Social Security*, 2011 WL 55523669, *3 (N.D.Ohio,2011).  The Court noted that the regulation expressly contains a "good reasons" requirement.  *Id.* (*citing and quoting* 20 C.F.R. § 404.1527(d)(2)).  The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

      1.      State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.

2.    Identify evidence supporting such finding.

3.    Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.

*Id.* (*citing Wilson,* 378 F. 3d at 546).

The Court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error, drawing a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business. *Id.* The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error. *Id.* It concluded that the requirement in Section 1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right exempt from the harmless error rule. *Id.*

In judging compliance with the treating source rule, the Magistrate finds that the ALJ considered the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship with Dr. Schweid, supportability of his opinions, the consistency of his opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion Dr. Schweid. Acknowledged as Plaintiff's treating mental health practitioner, Dr. Schweid treated Plaintiff frequently during 2010 and 2011. The ALJ even found his diagnoses controlling and acknowledged the propriety of conclusions made by Dr. Schweid in the MENTAL IMPAIRMENT QUESTIONNAIRE (Docket No. 11, p. 26 of 878).

The ALJ discredited Dr. Schweid's opinions because she found them inconsistent with both his treatment notes and the medical record as a whole. The medical record as a whole establishes that Plaintiff suffers from schizoaffective disorder, arthritis in her knees, and diabetes. However, the record also contains varying conclusions as to the duration and severity of Plaintiff's symptoms. The ALJ noted that Plaintiff's progress notes "document well-controlled symptoms and a stable mental

24

health condition, and a few isolated psychological assessments, which generally find the Plaintiff's symptoms are manageable and of at most a moderate severity" (Docket No. 11, p. 26 of 878).

The record contains substantial evidence for the ALJ to have reasonably concluded that Dr. Schweid's opinions regarding Plaintiff's serious functional limitations were inconsistent with the medical record, and thus, not entitled controlling weight. The ALJ noted Plaintiff's "more recent treatment notes from 2010 and 2011," which frequently revealed that Plaintiff was "doing OK", eating and sleeping "OK," liked her medications, not depressed and was not having hallucinations or delusions. Further eroding Dr. Schweid's opinions regarding Plaintiff's alleged serious limitations are his own notes which reveal a "cooperative" patient who displayed proper judgment and presented with a "euthymic mood"[4] (Docket No. 11, p. 25 of 878). The ALJ also noted that Dr. Schweid found only moderate limitations in the domain of functioning and no episodes of decompensation that were of an extended duration (Docket No. 11, p. 23 of 878). The ALJ came to the conclusion that examination of the medical record reveals that Plaintiff's condition "was relatively stable from a psychological standpoint when not using drugs, and when compliant with her prescribed medications." The Magistrate agrees, as Plaintiff's treatment notes reveal that her progression coincided with her abstention from drug and alcohol use and her compliance with treatment. Finally, the ALJ considered the treatment of State Agency psychological consultant Dr. Warren who "found Plaintiff retained the capacity to perform simple, routine work in a relatively static environment" (Docket No. 11, p.26 of 878). The ALJ gave Dr. Warren's opinion the most weight because it was consistent with the entire medical record.

Notwithstanding the medical evidence, the ALJ also considered the subjective testimony of

---

[4]

Euthymic pertains to a normal mood in which the range of emotions is neither depressed nor highly elevated. In essence, it is normal, non-depressed, reasonably positive mood. Medical-dictionary.thefreedictionary.com/euthymic.

25

Plaintiff, who testified that in addition to other forms of self employment, she worked up to ten hours a day as a cosmetologist in 2010.  She also testified that she cared for her daughter, cooked meals, cleaned, used public transportation and shopped.  These facts erode Plaintiff's argument that she cannot return to her past line of work, and provided good reasons for the ALJ's decision to discredit Dr. Schweid's opinions regarding Plaintiff's alleged severe limitations (Docket No. 11, p. 23 of 878).

**3.      IS THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY SUPPORTED BY SUBSTANTIAL EVIDENCE?**

"Residual functional capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." *Prescott v. Astrue,* 2012 WL 3403604, *12 (M.D.Tenn.,2012) *adopted by*, 2012 WL 3402813 (M.D.Tenn., 2012) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §200.00(c)).  With regard to the evaluation of physical abilities in determining a claimant's residual functional capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.
>
> 20 C.F.R § 404.1545 (c).
>
> According to Social Security Rule (SSR) 96-8p:
>
> Residual functional capacity is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.  The residual functional capacity assessment must be based on *all* of the relevant evidence in the case record. . . .

26

TITLES II AND XVI:  ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, *2, *5 (July 2, 1996).

Plaintiff is correct that the following must be considered under SSR 96-8p:  (1) medical history; (2) the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment; (3) reports of daily activities; (4) lay evidence; (5) medical source statements; (6) effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; and (7) evidence from attempts to work (Docket No. 11, p. 21 of 23).  Plaintiff contends that the ALJ's determination of her functional capacity was not supported by substantial evidence.  According to Plaintiff, the ALJ should have found she had a much more restricted functional capacity because of her inability to handle work stress and her need for redirection to complete tasks.  Furthermore, Plaintiff argues that Dr. Schweid's opinion, Virginia Brennan's opinion and Plaintiff's testimony that "even low stress is too much for her to handle" all support a more restrictive functional capacity determination (Docket No. 13, p. 21 of 23).

The ALJ notes that Plaintiff's mental health treatment was "limited and sporadic" and "generally secondary" to Plaintiff's substance abuse issues.  Indeed, the ALJ correctly noted that Plaintiff seemed to respond well to treatment in the beginning of 2010 shortly after her hospitalization for "induced psychosis."  The ALJ notes that during Aftercare treatment Plaintiff reported enjoying sobriety "due to reduced chaos and *stress*," and that she was cooperative and functioning well.  During more recent treatment in 2010 and 2011, Plaintiff's symptoms had been alleviated, she was "functioning well, doing OK, not depressed and had no hallucinations or delusions."  At this time, she was not using drugs or alcohol (Docket No. 11, pp. 24-25 of 878).

The ALJ does, note, however, Plaintiff's relapse in May and June of 2011, as Plaintiff began experiencing delusions and hallucinations again.  However, the ALJ acknowledges Plaintiff had

27

"recently abused alcohol" and had run out of medication.  This is consistent with the ALJ's belief that Plaintiff "was relatively stable from a psychological standpoint when not using drugs, and when compliant with her prescribed medication" (Docket No. 11, p. 25 of 878).

Plaintiff contends that the opinion of social worker Virginia Brennan supports her position of a more restrictive residual functional capacity.  Ms. Brennan found that Plaintiff was easily distracted and could not appropriately deal with the stress and pressures of working.  The ALJ discredited these findings because they were inconsistent with the record and contradicted Plaintiff's own testimony of her previous self employment, which would indicate she had no difficulties handling the stress and pressures of working (Docket No. 11, pp. 25-26 of 878). Moreover, Ms. Brennan's opinion is entitled to little weight because social workers are not listed as acceptable medical sources who can provide evidence to establish an impairment.  20 C.F.R. §§ 404.1513(a), 416.913(a).

The treatment of Plaintiff's treating physician, Dr. Schweid, also supports the ALJ's residual functional capacity determination.  As the ALJ notes, Dr. Schweid determined that Plaintiff "could satisfactorily remember work-like procedures, work in close proximity to others, perform at a consistent pace without an unreasonable number of breaks, respond appropriately to supervisors, respond appropriately to changes in the routine work setting, and interact with the general public."  He found only "moderate" limitations in her four mental domains of functioning. She had "no limitations in her ability to understand, remember and carry out short and simple instructions and make simple work-related decisions."  Dr. Schweid only found Plaintiff to be seriously limited in her "ability to maintain attention for two hour segments, deal with normal work stress, and likely be absent from work approximately two days per month" (Docket No. 11, p. 26 of 878)  Dr. Schweid's other findings, however, directly contradict these findings as they suggest,

28

along with Plaintiff's own testimony, that she had the ability to function in a work-like setting. Indeed, the ALJ notes that Plaintiff's testimony regarding the significant time she devoted to hair styling and providing child care during her alleged period of disability "does not comport with the severity and limiting effect the Plaintiff has alleged" (Docket No. 11, p. 28 of 878).

Finally, the ALJ indicated she gave the most weight to State Agency psychological consultant Dr. Vicki Warren.  She afforded it the most weight because it was consistent with the record as a whole.  The Magistrate agrees.

There is no evidence that the ALJ did not comport with the requirements of SSR 96-8p.  The fact that the residual functional capacity she found did not contain every medical opinion that would have suggested Plaintiff had more of a restricted residual functional capacity does not mean she did not evaluate all of the required opinions.  Rather, the record indicates a thorough analysis. She considered and gave weight to many of Dr. Schweid's opinions.  She also considered the opinions of social workers and nurses who treated Plaintiff.  She paid considerable attention to Plaintiff's subjective testimony.  While she came to varying conclusions as to the weight of various findings and opinions, her approach was consistent with the regulations which provide that the residual functional capacity determination is an "administrative assessment" reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-8p.

Therefore, the Magistrate finds that the ALJ comported with SSR 96-8p and had substantial evidence to support her determination of Plaintiff's residual functional capacity.

### VIII. CONCLUSION.

For these reasons, the Magistrate recommends that the Court affirm the Commissioner's decision denying SSI and DIB benefits and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   April 1, 2013

## IX.  NOTICE.

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.

30

31